UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

---

Lisa Sykes, et al.,

            Plaintiffs,                        1:08-mc-13

            V                              3-07 CV 660
                                                  Eastern District of
Bayer Corporation,                             Virginia

            Defendant.

---

Lisa Sykes declares as follows:

1. I was a plaintiff in the captioned action and, as such, am familiar with the facts recited below which are from my own knowledge, except where I am providing information which I have been told, in which case I believe the information to be true. Therefore, if called to testify in this matter, I would testify competently as follows:

2. I understand that this Court seeks to know why a subpoena was served upon Kathleen Seidel in this action. It is because we believe that Ms. Seidel is an agent of the defendant and other drug manufacturers used to intimidate potential plaintiffs and witnesses who seek access to the Courts of the United States due to injuries inflicted on their children by Thimerosal, a mercury based preservative used in vaccines and other drugs. This has had a

direct effect on our ability to present this case and has caused many potential witnesses to refuse to cooperate.

    3. I am a United Methodist minister in Richmond, VA. My son Wesley is autistic, and I believe that his condition was caused by mercury which he received due to Thimerosal in the Rho(D) injection I was given during pregnancy and in many of the vaccines he received during his first two and a half years of life. I began seeking more information on the use of Thimerosal in vaccines and other drugs and its effect on our children from federal officials, and my husband and I filed a claim to that effect within the National Vaccine Injury Compensation Program (NVICP)3. I understand that due to the number of claims filed by parents of autistic children within the Vaccine Injury program, the Office of Special Masters directed that all be included in an Omnibus proceeding, so that a few hearings could be held on the various theories of causation rather than separate hearings to weigh the causation claims thousands of times.

    5. In 2002 in consultation with my attorneys and others involved with this type of claim, I became aware that civil court offered a greater opportunity for needed discovery, due to the rules governing the NVICP. I also became aware that the program was not an ideal setting to explore issues such as whether the Federal Food, Drug and Cosmetic Act had been

violated by pharmaceutical companies and federal officials. Thus, I understood that Wesley's case was removed from the program and in 2006, it was filed in Eastern District of Pennsylvania where autism plaintiffs would have access to discovery as allowed by the Federal Rules of Civil Procedure.

      6. Because of this litigation and then due to my faith-based advocacy, I have become a target for many of Ms. Seidel's unfounded accusations. By examining the extent and the detail of Ms. Seidel's accusations, I believe that Ms. Seidel's sources of information extend well beyond those of a mother and housewife, supported by a few donations, as she claims on her web site, Neurdiversity.com.

      7. I became a target of Ms. Seidel's attention for the first time on February 19, 2006, just before this case was filed in the Eastern District of Pennsylvania:

> Also at that conference, a Methodist minister from Virginia, Rev. Lisa Sykes, offered an emotional testimonial about the results of "the Lupron protocol" on her autistic son. In her testimony, Rev. Sykes expressed her joy in the unfolding of her son's communicative abilities; her fascination with the drastic fluctuations in his testosterone levels precipitated by the medication; her attribution of her son's behavioral improvement to the "Lupron protocol"; her admiration for the Geiers; and her outrage that her son was presumably poisoned by thimerosal in his vaccines.

http://neurodiversity.com/weblog/article/83/

8. This entry on her website is part of a larger piece attacking the credibility of my son's treating physicians: Dr. Mary Megson and Dr. Mark Geier, both of whom were experts in Wesley's legal case, and Dr. Geier in the Omnibus proceeding, which was continuing and at that time included the claims of well over 3,000 children and now includes over 4,500. Ms. Seidel focused on this case as soon as it was filed in Pennsylvania, and it was obviously being carefully tracked. Her website anounced:

> In October 2002, Rev. and Mr. Sykes voluntarily withdrew their claim, and three months later gave notice of their intention to file a civil suit.
>
> On March 14, 2006, Rev. and Mr. Sykes filed Lisa Sykes et al. v. Glaxo Smith-Kline et al. (Case 2:06-cv-01111-LS) in the U.S. District Court for the Eastern District of Pennsylvania.

http://neurodiversity.com/weblog/article/126/#courts

9. Thereafter, everything about the case was published on her web site. A tremendous amount of information about me personally was also published, even including the devotion I wrote for the 2007 Lenten Devotional of the Virginia Annual Conference of the United Methodist Church. Some of that information was public; however, her knowledge of my personal life went beyond public knowledge or, at least, easy public knowledge, and surely represents a significant commitment of hours in researching me.

10. In 2006, an advocacy organization of which I was, and still remain, a part, CoMeD, filed a formal request that the FDA order that all mercury-containing drugs be recalled. The reply denying that request was date stamped Sept. 26, 2006 and was mailed to us. Our organization received it on September 27, 2006. It was not posted on the FDA's web site until October 24, 2006. Ms. Seidel published this letter on her web site on October 2, 2006 with links to every document referred to in the rejection letter. When it was placed on the FDA's web site, 22 days later, the citations were not linked to the documents in issue. Thus, Ms. Seidel not only had the document well before it was available to the public, she had all the underlying documentation. Ms. Seidel, far form being the dedicated mother-housewife, working with her equally dedicated husband with limited funding, had access inside the FDA, investigative capacity well beyond that she claimed.

11. In this case, nearly every document was on her web site nearly the day it would have been received by the defendant's attorneys. While documents filed with the Court are available to anyone having a Pacer Account, some documents she accessed were not filed in the court in which the case was filed, but she had those documents also.

12. Dr. Mark Geier was an expert witness in this matter as well as in the Omnibus Autism matter. He has testified in numerous other cases relating to vaccines. Dr. Geier has been a principal target of Ms. Seidel. I understand that his license to practice medicine has been challenged by a friend of Ms. Seidel, apparently the wife of a drug company executive based upon allegations of misconduct found on Ms. Seidel's web site. Ms. Seidel and her husband have apparently obtained control of Wikipedia, a free internet encyclopedia, and have used that to injure Dr. Geier's reputation. I am also aware that Ms. Seidel launched a campaign directed at TAP, the manufacturer of Lupron, a drug Dr. Geier is using to decrease the symptoms of autism in children with high testosterone levels. Ms. Seidel bragged about having dissuaded the company form participating in that study due to the Geier's role in this case and others:

> Non-involvement seemed prudent, given the Geiers' profession as legal consultants to plaintiffs in vaccine-injury cases...

http://neurodiversity.com/weblog/article/111/

13. I understand, as the result of that campaign, the manufacturer backed out of a double blind study of the Lupron Protocol Dr. Geier had developed. This directly interfered with Dr. Geier's business interests but is a greater tragedy than that. My son is the first child to receive Dr. Geier's Protocol, and as the result, he is greatly improved. While Ms. Seidel is

fanatically opposed to any treatment of autism related to vaccine toxicity, it is clear from the malice shown in all of her writings, that her actions against Dr. Geier go well beyond debate. They are designed to destroy him professionally, personally and financially due to his being a witness in this and other cases. Her actions are also denying children a form of treatment that might benefit them tremendously by blocking and thus postponing clinical trials indefinitely. Ms. Seidel claims to oppose only unproven treatments of autism, but all treatments follow tests to determine if an apparently favorable result of a procedure or drug can be repeated in numerous subjects. Here, Ms. Seidel has kept that test from being performed at all in order to punish Dr. Geier for his being a witness in this and other cases.

14. Ms. Seidel has sought to discredit me and my faith-based efforts to get mercury banned from medicine, in a campaign directed at my denomination. First and foremost, my Bishop and all the key denominational officials involved with my efforts in the United Methodist Church were at all times well aware of my son's condition and my legal and extra legal efforts, first to get answers and then to act, including this lawsuit, both within the VICP and then in the United States Courts. Therefore, Ms. Seidel's repeated inference that I have a hidden agenda, that I was hiding

these facts form my Church or that the Church was hiding this from the public was at all times defamatory as she is stating that I am dishonest.

15. In 2004, I began a successful three and a half year effort to bring the issue of mercury in medicine before my denomination. This began with my careful and intentional efforts to inform the Virginia Annual Conference of the United Methodist Church regarding the dangers of mercury in medicine, and then to lead it to pass a resolution in 2005 calling for "Protecting Children from Mercury-containing Drugs." Afterward, in 2006, the Women's Division of the General Board of Global Ministries, a global organization of nearly 1 million United Methodist Women, passed a similar resolution, and in 2007, the Women's Division actively began to give witness to this issue by sponsoring a teach-in in Atlanta, Georgia, on June 7, and sharing in a parent-sponsored rally at the gates of the Centers for Disease Control and Prevention on June 8.

16. Ms. Seidel's commentary against all these faith-based efforts followed the filing of this action in Pennsylvania. It had the effect of impugning me to those in my denomination with oversight for my conduct of my ministry. She also insinuated that I have misused my pastoral office in a far-fetched attempt, which she asserts I mischaracterized as a "valiant

search for justice," to manipulate my denomination for the specific purpose of bilking pharmaceutical companies of millions of dollars:

> Rev. Sykes has represented her campaign as a struggle between good and evil, a valiant crusade to protect the most vulnerable individuals in society from heartless, indefensible baby poisoners, a battle against dark forces responsible for perpetrating heinous crimes against humanity and stealing from children "the future that God intends for them." The situation is not so simple as that. The current litigation-inspired "vaccine safety" crusade is also a for-profit enterprise in which Rev. Sykes and her colleagues have a significant financial stake. That stake — as well as the full range of arguments and evidence relevant to the "vaccine safety" debate — should be fully disclosed to all persons invited to consider her arguments, the evidence she presents to support them, and the "experts" upon whom she relies.

17. Not only does Ms. Seidel accuse me of withholding information from my superiors about the lawsuit, a charge which is patently false, but she also grandly suggests that my Bishop, the Women's Division, and others have improperly discharged their offices by supporting my efforts to make vaccines safer:

- Does the United Methodist Church and Women's Division require that its leadership and staff disclose conflicts of interest with respect to their church-related responsibilities?
- Have either Rev. Sykes or Kelly Kerns ever fully disclosed the extent of their involvement in vaccine-injury litigation to the congregations, Methodist colleagues and superiors to whom they appealed for support of their "vaccine safety" campaign? Was Women's Division executive Julie Taylor aware of Rev. Sykes' status as plaintiff in a twenty million dollar product liability lawsuit, or aware of the size of her legal team, when she planned

and announced the upcoming "educational event," described families who subscribe to unproven theories of autism causation as "marginalized," and characterized their efforts as a "search for truth" and "questioning"? ...

- Did Rev. Sykes disclose to the United Methodist Church and Women's Division the fact that the "team of researchers" who spoke at their press conference are all consultants to plaintiffs in vaccine-injury litigation, and that their claims and methods are accorded little credence within the medical and scientific community? Did Bishop Kammerer exercise due diligence prior to committing church resources to support Rev. Sykes' campaign, and prior to using the authority of her position to lend credibility to and create media opportunities for Rev. Sykes' expert witness associates?

18. Ms. Seidel's efforts have damaged me personally, as intended. Recently, the senior pastor at the church to which I am currently appointed by my Bishop, suggested to me that the congregation might not request my reappointment for the following year, as some congregation members had taken exception to my advocacy work on the issue of mercury. In addition, a new member of the church who heard that I was in an upcoming PBS documentary on the issue, walked into my office some weeks ago, and said, "There are some really mean things about you on the internet." I would wager that these members have searched the internet and read Ms. Seidel's posts, as the church publicity on my advocacy work has only affirmed me in my efforts.

19. Wesley's entire medical team also became targets of Ms. Seidel's efforts due to their support for our claim and me personally. After they had spoken at a press conference sponsored by the Virginia Annual Conference of the United Methodist Church, Ms. Seidel wrote:

> "To the Council of Bishops, the General Board of Global Ministries, the General Board of Church and Society, and the Women's Division of the United Methodist Church, and the Virginia Interfaith Center for Public Policy(…)"
>
> I urge the United Methodist Church and Women's Division to consider the possibility that Rev. **Lisa Sykes and her team of legal and medical advisers** might be sincerely mistaken in their conclusions regarding the cause of autism; that their quest for multi-million-dollar money damages and assumption of bad faith on the part of many specific and nonspecific targets of blame, may have impaired their judgment and capacity for objectivity; **and that a campaign that appears to support a valiant search for justice conducted by righteously aggrieved underdogs may in fact support a dogged search for validation of a scientifically insupportable *idée fixe* by those determined to exact retribution for imagined injustices, and determined to prevail in debate and high-stakes litigation regardless of the merit of their arguments.**

20. Subsequently, when she was unable to deter the church leadership from its intensifying advocacy on this issue, Ms. Seidel complained, in a letter to Julie Taylor, Exec Sec. for Children, Youth and Family Advocacy:

> Nowhere in these materials have you disclosed the fact that the United Methodist Church employee responsible for initiating the UMC "vaccine safety" campaign has a substantial financial interest in the outcome of pending litigation directly related to the subject of that

> campaign. By dismissing the significance of **Rev. Sykes' own conflicts of interest,** you and your colleagues have created one of your own.
>
> …
>
> § Did Rev. Sykes disclose to you and your colleagues the fact that the **"team of researchers"** who spoke at your press conference are all consultants to plaintiffs in vaccine-injury litigation, and that their claims and methods are accorded little credence within the medical and scientific community?
>
> You have characterized Rev. Sykes' quest with gentle, righteous euphemisms such as "searching for truth," "questioning," "asking," and "judicial advocacy." **Her quest can also be characterized as the pious public facade of a coordinated campaign by a coalition of plaintiffs, lawyers and entrepreneurs who promote the idea that the majority of cases of autism are caused by vaccine-injury as part of an aggressive attempt to extract money damages from innocent parties for imagined wrongdoing.** This effort is supported by scientific "evidence" much of which was manufactured after the initiation of litigation by individuals with a demonstrable financial interest in the promotion of unproven autism treatments and the perpetuation of conflict over vaccines, and some of which is of highly questionable provenance.
>
> **You have denied any intention of helping Rev. Sykes seek compensation through legal action; by your actions, you and your colleagues are doing exactly that.**

Ms. Seidel clearly suggests: that I have deceived the Church, that I have ulterior financial motives for involving the church in my "crusade," that my experts are participating in this "pious public façade," and that agencies of the church itself are now aiding me in my deceptive efforts to extract money unjustly from the pharmaceutical companies. These accusations were sent to a tremendously long list of United Methodist bishops and to every relevant

church agency Ms. Seidel could name. My profession is based on faith. Integrity and accountability are key characteristics absolutely required to be a minister. These accusations, had they been given credence, could have ended not only my advocacy work but also my viability in an itinerant form of ordained ministry, i.e. my current employment and my employability generally.

21. In the face of Ms. Seidel's accusations, it was decided that the General Board of Global Ministries would not make any comment on the issue of mercury in medicine at that time and that only a representative of the Women's Division would respond to Ms. Seidel. I am grateful that my denomination remained undeterred, and even has since passed the first faith-based global resolution, "Protecting Children from Mercury-containing Drugs," on April 29, 2008.

22. I have spoken to a large number of parents of autistic and other children who believe that their children have been injured by vaccines, and the mercury-based component thimerosal. Many report that they first could not find a lawyer willing to handle their claim and then, that their doctor(s) was/were reluctant to testify even in the few cases were the doctor suggested that the vaccine was the most likely cause of the disorder. I have witnessed

financial support from the defendant and perhaps others in this now dismissed case, directly or indirectly.

24. Thus, activity such as that of Ms. Seidel is having the effect of not only discouraging research and treatment of mercury-induce illness, she is preventing injured children from being able to prove their claims by dissuading witnesses from participating in appropriate lawsuits by a pattern of malicious harassment.

25. Ms. Seidel's activity has caused me to have to explain and/or defend my actions for my son to the leaders of my church and to some members of my congregation. With each published attack on me, I have diligently notified my own bishop and Ms. Julie Taylor, of the Women's Division of the General Board of Global Ministries. I have upheld the good character and rectitude of Wesley's doctors to those in my hierarchy prior to their speaking at the teach-in on mercury in medicine sponsored by our church. Dr. Geier and his son have been required to defend their reputations, including defending against a complaint filed against Dr. Geier's medical license. All of this is apparently an attempt to punish them for their participation in this issue, and especially in Wesley's lawsuit, and to intimidate anyone else who files or participates in such a claim.

26. I understand that the purpose of this subpoena was to explore whether Ms. Seidel was getting any support in her efforts to harass our witnesses and myself from the defendants. I understand that such harassment would have been extremely relevant to this matter as a United States Court has the right to defend the integrity of its processes.

I declare this 12th day of May at Richmond, Virginia, under penalty of perjury that the forgoing is true to the best of my knowledge and belief.